NICOLA T. HANNA
United States Attorney
BRANDON D. FOX
Assistant United States Attorney
Chief, Criminal Division
ROBERT J. KEENAN (Bar No. 151094)
Assistant United States Attorney
    UNITED STATES ATTORNEY'S OFFICE
    411 W. Fourth Street
    Suite 8000
    Santa Ana, California 92701
    Telephone: (714) 338-3597
    Facsimile: (714) 338-3708
    E-Mail:  rob.keenan@usdoj.gov

Attorneys for Plaintiff
UNITED STATES OF AMERICA

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

SOUTHERN DIVISION

| UNITED STATES OF AMERICA, | Case No. SA CR 08-197-DOC |
|---|---|
| Plaintiff, | GOVERNMENT'S OPPOSITION TO DEFENDANT'S UNEXHAUSTED MOTION TO REDUCE SENTENCE PURSUANT TO 18 U.S.C. § 3582(C)(1)(A) |
| v. | |
| VO DUONG TRAN, | |
| Defendant. | |

Plaintiff United States of America, by and through its counsel of record, the United States Attorney for the Central District of California and Assistant United States Attorney Robert J. Keenan, hereby files this response to defendant's unexhausted motion to reduce his sentence pursuant to 18 U.S.C. § 3582(c)(1)(A).

The government asks this Court to dismiss the motion without prejudice, or grant a stay, due to defendant's failure to exhaust administrative remedies.  If the Court reaches the merits, the

1  government further argues that the motion must be denied because

2  defendant is not eligible for compassionate release under applicable

3  law.

4       This response is based upon the attached memorandum of points

5  and authorities, the files and records in this case, and such further

6  evidence and argument as the Court may permit.

7  DATED: April 9, 2020.          Respectfully submitted,

8                                 NICOLA T. HANNA
                                   United States Attorney
9
                                   BRANDON D. FOX
10                                 Assistant United States Attorney
                                   Chief, Criminal Division
11

12                                     /s/ R.J.K.
                                   ROBERT J. KEENAN
13                                 Assistant United States Attorney

14                                 Attorneys for Plaintiff
                                   UNITED STATES OF AMERICA
15

16

17

18

19

20

21

22

23

24

25

26

27

28

**TABLE OF CONTENTS**

DESCRIPTION                                                                 PAGE

I.    INTRODUCTION...................................................1

II.   STATEMENT OF FACTS.............................................2

      A.   Defendant's Crimes.......................................2

      B.   Trial & Sentencing.......................................3

      C.   Appeal & Post-Conviction Litigation......................4

      D.   July 2018: Resentencing Hearing..........................4

      E.   Incarceration and Projected Release Date.................6

      F.   Defendant's Failure to Exhaust Administrative Remedies....6

      G.   The Bureau of Prisons' and Congress's Response to
           COVID-19.................................................8

           1.   BOP's COVID-19-Specific Safety Precautions..........8

           2.   Administrative Options Available to Inmates........12

III.  LEGAL FRAMEWORK FOR COMPASSIONATE RELEASE.....................15

IV.   ARGUMENT......................................................18

      A.   Defendant Has Failed to Exhaust Administrative
           Remedies, And The Court Lacks Jurisdiction to Consider
           His Claims..............................................18

           1.   Defendant Has Not Clearly Filed An Administrative
                Request For Compassionate Release And, Even If He
                Did So On The Date Alleged), He Has Not Waited
                The Requisite 30-Days To Allow BOP To Consider
                Any Such Request...................................19

           2.   Failure to Exhaust Cannot be Excused...............20

      B.   Defendant Has Failed to Demonstrate an "Extraordinary
           and Compelling" Reason to Grant Permanent
           Compassionate Release...................................23

           1.   Defendant is Not eligible for Compassionate
                Release............................................24

           2.   Defendant Remains a Danger to the Community,
                Which Also Defeats his Eligibility for Release.....28

      C.   Even If Defendant Were Otherwise Eligible, 18 U.S.C.
           § 3553(a) Factors Do Not Support a Shorter Sentence.....29

i

**TABLE OF CONTENTS (CONTINUED)**

DESCRIPTION                                                                                      PAGE

V.    CONCLUSION.................................................31

**TABLE OF AUTHORITIES**

DESCRIPTION                                                    PAGE(S)

**CASES**

Bowles v. Russell,
        551 U.S. 205 (2007)........................................20

Dillon v. United States,
        560 U.S. 817 (2010)............................15, 16, 21, 24

Fort Bend County v. Davis,
        139 S. Ct. 1843 (2019)....................................21

Landgraf v. USI Film Prods.,
        511 U.S. 244 (1994).......................................20

Meyers v. Bethlehem Shipping Corp.,
        303 U.S. 41 (1938)........................................21

Reeb v. Thomas,
        636 F.3d 1224 (9th Cir. 2011).............................12

Ross v. Blake,
        136 S. Ct. 1850 (2016)....................................21

Shaw v. Bank of America Corp.,
        946 F.3d 533 (9th Cir. 2019)....................15, 18, 20

United States v. Applewhite,
        No. 08-CR-60037,
        2020 WL 137452 (D. Or. Jan. 13, 2020)....................28

United States v. Ayon-Nunez,
        No. 16-CR-130-DAD,
        2020 WL 704785 (E.D. Cal. Feb. 12, 2020).................26

United States v. Butler,
        970 F.2d 1017 (2d Cir. 1992)..............................17

United States v. Chambliss,
        948 F.3d 691 (5th Cir. 2020)..............................17

United States v. Davis,
        No. 19-1604,
        ECF No. 50 (3d Cir. Mar. 20, 2020).......................27

United States v. Ebbers,
        --- F. Supp. 3d. ---,
        2020 WL 91399 (S.D.N.Y. Jan. 8, 2020)...........17, 22, 23

United States v. Eberhart,
        No. 13-CR-313-PJH-1,
        2020 WL 1450745 (N.D. Cal. Mar. 25, 2020).......20, 21, 22, 24

**TABLE OF AUTHORITIES (CONTINUED)**

<u>DESCRIPTION</u>                                                                      <u>PAGE</u>

United States v. Gileno,
     No. 19-CR-161-VAB-1,
     2020 WL 1307108 (D. Conn. Mar. 19, 2020)...................22, 26

United States v. Gotti,
     No. 02-CR-743,
     2020 WL 497987 (S.D.N.Y. 2020)................................28

United States v. Grass,
     561 F. Supp. 2d 535 (E.D. Pa. 2008)..........................12

United States v. Greenhut,
     No. 18-CR-48-CAS,
     2020 WL 509385 (C.D. Cal. Jan. 31, 2020).....................17

United States v. Hamilton,
     715 F.3d 328 (11th Cir. 2013)................................17

United States v. Hir,
     517 F.3d 1081 (9th Cir. 2008)................................29

United States v. Mangarella,
     No. 06-CR-151,
     2020 WL 1291835 (W.D.N.C. Mar. 16, 2020).....................17

United States v. Mayer,
     235 U.S. 55 (1914)...........................................21

United States v. Nasirun,
     No. 99-CR-367,
     2020 WL 686030 (M.D. Fla. Feb. 11, 2020).....................24

United States v. Neman,
     No. 14-521-JAK,
     ECF No. 863 (C.D. Cal. Mar. 30, 2020)....................22, 23

United States v. Raia,
     No. 20-1033,
     2020 WL 1647922 (3d Cir. Apr. 2, 2020)...............19, 22, 23

United States v. Shah,
     No. 10-70-CJC,
     ECF No. 329 (C.D. Cal. Mar. 30, 2020)....................21, 26

United States v. Sloane,
     No. 19-CR-10117-IT-11,
     ECF No. 647 (D. Mass. Mar. 19, 2020).........................22

United States v. Urso,
     No. 03-CR-1382,
     2019 WL 5423431 (E.D.N.Y. Oct. 23, 2019).....................28

iv

1

<u>TABLE OF AUTHORITIES (CONTINUED)</u>

2 <u>DESCRIPTION</u>                                                            <u>PAGE</u>

3  <u>United States v. Wages</u>,
        271 F. App'x 726 (10th Cir. 2008)..............................17
4
   <u>United States v. Weidenhamer</u>,
5        No. CR16-01072-001-PHX-ROS,
        2019 WL 6050264 (D. Az. Nov. 8, 2019)........................15
6
   <u>United States v. Willingham</u>,
7        No. CR113-010,
        2019 WL 6733028 (S.D. Ga. Dec. 10, 2019)....................24
8
   <u>United States v. Willis</u>,
9        382 F. Supp. 3d 1185 (D.N.M. 2019)...........................17

10 **<u>STATUTES</u>**

11 18 U.S.C. § 3142(g).........................................21, 23

12 18 U.S.C. § 3582(c).......................................passim

13 18 U.S.C. § 3621(b)............................................6

14 18 U.S.C. § 3622...........................................6, 8

15 18 U.S.C. § 3624..............................................6

16 28 U.S.C. § 994(t).......................................9, 10, 22

17 **<u>OTHER AUTHORITIES</u>**

18 Attorney General, Memorandum for Director of Bureau of Prisons
        Re: Increasing Use of Home Confinement at Institutions Most
19       Affected by COVID-19 (April 3, 2020),
        <u>available at</u> https://www.justice.gov/file/1266661/download.....7
20
   Attorney General, Memorandum for Director of Bureau of Prisons
21       Re: Prioritization of Home Confinement as Appropriate in
        Response to COVID-19 Pandemic (March 26, 2020),
22       <u>available at</u> https://www.justice.gov/file/1262731/download.....8

23 California Executive Order N-33-20 (March 19, 2020),
        <u>available at</u> https://covid19.ca.gov/img/Executive-Order-N-
24       33-20.pdf....................................................22

25 Coronavirus Aid, Relief, and Economic Security Act ("CARES
        Act"),
26       Pub. L. No. 116-136,
        134 Stat. 281 (March 27, 2020)................................6

27

28

**TABLE OF AUTHORITIES (CONTINUED)**

<u>DESCRIPTION</u>                                                        <u>PAGE</u>

Federal Bureau of Prisons Health Services Division, Pandemic
      Influenza Plan---Module 1: Surveillance and Infection
      Control (Oct. 2012),
      <u>available at</u>
      https://www.bop.gov/resources/pdfs/pan_flu_module_1.pdf........3

Federal Bureau of Prisons Health Services Division, Pandemic
      Influenza Plan---Module 3: Health Care Delivery (Oct.
      2012),
      <u>available at</u>
      https://www.bop.gov/resources/pdfs/pan_flu_module_1.pdf........4

Federal Bureau of Prisons Program Statement No. 5050.50,
      Compassionate Release/Reduction in Sentence: Procedures for
      Implementation of 18 U.S.C. §§ 3582 and 4205(g) (January
      17, 2019),
      <u>available at</u>
      https://www.bop.gov/policy/progstat/5050_050_EN.pdf........8, 18

Federal Bureau of Prisons Program Statement No. 5280.09, Inmate
      Furloughs (January 20, 2011),
      <u>available at</u>
      https://www.bop.gov/policy/progstat/5280_009.pdf...............8

Federal Bureau of Prisons Program Statement No. 6190.04,
      Infectious Disease Management (Jun. 3, 2014),
      available at
      https://www.bop.gov/policy/progstat/6190_004.pdf...............4

Federal Bureau of Prisons, Action Plan Phase V (Mar. 31, 2020),
      <u>available at</u>
      https://www.bop.gov/resources/news/20200331_covid19_action_
      plan_5.jsp..................................................4, 5

Federal Bureau of Prisons, COVID-19 Action Plan: Agency-Wide
      Modified Operations (Mar. 13, 2020),
      <u>available at</u>
      https://www.bop.gov/resources/news/20200313_covid-19.jsp....4, 5

Federal Bureau of Prisons, COVID-19 Coronavirus,
      <u>available at</u> https://www.bop.gov/coronavirus/index.jsp.........6

Federal Bureau of Prisons, Home Confinement (Apr. 5, 2020),
      <u>available at</u>
      https://www.bop.gov/resources/news/20200405_covid19_home_co
      nfinement.jsp................................................7

**TABLE OF AUTHORITIES (CONTINUED)**

DESCRIPTION                                                                    PAGE

Federal Bureau of Prisons, Statement from BOP Director (Mar. 26,
        2020),
        <u>available at</u>
        https://www.bop.gov/resources/news/20200326_statement_from_
        director.jsp...........................................3, 5, 6

Federal Bureau of Prisons, Update on COVID-19 (Mar. 24, 2020),
        <u>available at</u>
        https://www.bop.gov/resources/news/pdfs/20200324_bop_press_
        release_covid19_update.pdf....................................5

Federal Bureau of Prisons, Updates to BOP COVID-19 Action Plan:
        Inmate Movement (Mar. 19, 2020),
        <u>available at</u>
        https://www.bop.gov/resources/news/20200319_covid19_update.
        jsp   3

**<u>REGULATIONS</u>**

USSG § 1B1.13...............................................passim

1

## I.   <u>INTRODUCTION</u>

2        Defendant VO DOUNG TRAN is an ex-Special Agent of the FBI, who,

3   after being fired from that position, resorted to a life of crime.

4   As the government established at trial in 2009, before Judge

5   Guilford, defendant TRAN operated an interstate home-invasion robbery

6   scheme.  Over the course of six months, TRAN engaged in extensive,

7   recorded conversations with a CI and an undercover agent during which

8   he planned a home-invasion robbery of a purported drug-stash house in

9   Fountain Valley, CA.  In July 2008, TRAN flew out to Orange County

10  with his co-defendant (YU SUNG PARK) to commit the robbery.  Once

11  here, they assembled an arsenal of five firearms (including a

12  machinegun, silencer-equipped AR-15 rifle, and silencer-equipped

13  handgun), hundreds of rounds of ammunition, zip-ties, and body armor.

14       In his pending motion, TRAN nonetheless requests an immediate

15  and <u>permanent</u> compassionate release from imprisonment due to the

16  COVID-19 epidemic.  Moreover, he does so prematurely without having

17  satisfied 18 U.S.C § 3582(c)(1)(A)'s mandatory administrative-

18  exhaustion requirement or eligibility criteria and while ignoring the

19  18 U.S.C. § 3553(a) factors and his continuing danger to the

20  community.  Neither statutory authority nor public health demands

21  such a windfall.  Moreover, defendant's logic would endorse the mass,

22  permanent release of convicted criminals <u>into</u> a pandemic, without

23  regard for the factors justifying their sentences or for the Bureau

24  of Prisons' (BOP's) individualized risk assessment.  That is not a

25  way to fight disease and not a way to protect the public.

26       The motion should be dismissed without prejudice, or stayed,

27  until defendant has exhausted his administrative remedies within BOP.

28  <u>First</u>, has failed to comply with the mandatory exhaustion requirement

of 18 U.S.C. § 3582(c), which thus requires dismissal of the motion or, at minimum, a stay until the BOP has had an opportunity to assess defendant's request or his eligibility for home confinement.  Second, even if the Court could reach the motion's merits, defendant is neither eligible for, nor entitled to, compassionate release.

## II.  <u>STATEMENT OF FACTS</u>

### A.  <u>Defendant's Crimes</u>

In July 2008, after six months of planning, defendant TRAN and his co-defendant, YU SUNG PARK ("PAR"), traveled to California from their home states of Louisiana and Illinois to commit a violent, home-invasion robbery of a residence that they believed was a stash-house used by drug-traffickers to store large amounts of cash and drugs.  Upon their arrival in Orange County, defendants got a hotel room and assembled an arsenal in preparation for the robbery, including (1) a fully-automatic machinegun; (2) an AR-15 assault rifle equipped with a silencer; (3) three handguns, one of which was equipped with a silencer and netting to catch discharged shell casings; (4) 30 magazines fully-loaded with 600 rounds of ammunition; (5) four bullet proof vests; (6) raid gear; and (7) several large "zip-ties" that they intended to use to restrain the occupants of the stash-house.  (<u>See</u> Ex. "A" for photos of defendant's cache of firearms.)

While armed with a handgun, defendants then met up with two supposed co-conspirators to plan the robbery.[1]  After casing the stash-house, defendants met with the others in a hotel room to plan

---

[1]  The two supposed co-conspirators were, in fact, an undercover FBI Agent ("UC Agent") and a Confidential Informant ("CI").

2

exactly how they would commit the robbery, which they agreed would be committed on the following day.  They were deadly serious. Defendants instructed the CI and UC Agent about the following matters: (1) the number of guys who would make entry into the house; (2) tactics for making a forcible entry into the house and subduing the occupants, with PARK noting "I'd rather zip-tie him up and use him as a shield"; (3) the need to "shoot" anyone who runs, with PARK stressing that you "can't miss" and "take two or three shots at one guy"; (4) whether neighbors would hear if they "light off a fuckin' M16 round"; and (5) who would stay outside to serve as a lookout, getaway driver, and handle the "big gun" (i.e., the machinegun) in the event "black-and-whites" showed up.  PARK quipped that the raid would be "like shooting fish in a barrel."

B.   **Trial & Sentencing**

In March 2009, a jury convicted defendants TRAN and PARK of the following offenses: (1) conspiracy to commit a robbery affecting interstate commerce, in violation of 18 U.S.C. § 1951(a) ("the Hobbs Act"), (2) interstate travel and acquisition of a firearm with intent to commit a robbery, in violation of 18 U.S.C. § 924(g); (3) possession of firearms in furtherance of a "crime of violence," namely, the Hobbs Act robbery conspiracy charged in Count One and the § 924(g) offense charged in Count Two; and (4) possession of a machinegun, in violation of 18 U.S.C. § 922(o)(1).  (CR 161.)  The verdicts on the 924(c) count triggered a mandatory-minimum sentence of 30 years because the offense involved a machinegun and silencers.

On April 26, 2010, after denying post-trial motions for acquittal and new trial, this Court (per Judge Guilford) sentenced

3

both defendants TRAN and PARK to a term of 30 years' imprisonment, the minimum sentence then allowed by law.  (CR 253, 255.)

## C.   Appeal & Post-Conviction Litigation

On May 24, 2012, the Ninth Circuit affirmed defendants' convictions on all counts.  (See CR 291; see also 9th Cir. Case Nos. 10-50207 & 10-50268.)  Defendants TRAN and PARK thereafter filed § 2255 motions to vacate their convictions and sentences on various grounds.

On March 30, 2018, the Court (per Judge Guilford) denied defendants' § 2255 motions as to most of their claims, but granted it in part as to Count 3, the § 924(c) count.  Specifically, the Court vacated their convictions and sentences on Count 3 on the ground that § 924(c) is unconstitutionally vague under Johnson v. United States, 135 S. Ct. 2551 (2015), and the Ninth Circuit's decision in Dimaya v. Lynch, 803 F.3d 1110 (9th Cir. 2015), affirmed Sessions v. Dimaya, 138 S. Ct. 1204 (2018).

## D.   July 2018: Resentencing Hearing

The order vacating the § 924(c) conviction and its 30-year mandatory-minimum sentence required both defendants to be resentenced.  On July 11, 2018, the Court held a hearing for the resentencing of defendants on the three remaining counts of conviction for the Hobbs Act robbery conspiracy (Count 1) and the related firearms offenses (Counts 2 and 4).  (See CR 378, 380; see also CR 394, RT 7/11/2018.)

TRAN argued for a time-served sentence of approximately 10 years, noting that he had by then already served a lengthy sentence, had a satisfactory record of good behavior while in prison, had no prior criminal history, and had a supportive family.  (See CR 370;

4

1   see also RT 7/11/2018: 15-20.)  The government argued for a 30-year

2   sentence, as Dimaya had not yet been decided by the Supreme Court and

3   the government maintained that § 924(c)'s 30-year mandatory-minimum

4   still controlled.  Under § 3553(a), the government strongly opposed

5   defendants' requests for a time-served sentence because both

6   defendants posed a danger to the community.

7        Notwithstanding defendant's claim that he was a changed man and

8   a time-served sentence of 10 years was sufficient, the Court

9   sentenced defendant to a sentence of 15 years' imprisonment, above

10  the Guidelines range.  (CR 378, 379; see also CR 394; RT 7/11/18: 37-

11  40.)  In explaining its sentence, the Court acknowledged that

12  defendant had "done a good job in prison" and had "lot[s] of support

13  from others," which "speaks well of [defendant TRAN]."  (CR 394; RT

14  7/11/18: 37.)  However, the Court said it felt a sentence of 15

15  years' imprisonment was necessary to achieve the goals of sentencing

16  under § 3553(a).  (RT 7/11/18: 37-40.)  Judge Guilford said that one

17  of the "things that continue[d] to trouble [him] about the

18  defendants" was "the callousness of the crimes that you were

19  convicted of," which goes to the "nature and circumstances of the

20  offense."  (Id. at 37.)  Judge Guilford noted that he was "still ...

21  affected" by the conduct which was "summarized by the government" as

22  follows:

23              "The insouciant nihilism exhibited by the
               defendants make them very dangerous to society.
24              By their words and deeds, defendants have made
               clear they care only for themselves and recognize
25              no moral limitations on their behavior.  In some
               of the more chilling undercover statements, Tran
26              repeatedly told the CI that he and his 'dialed-in
               guy' ... always had a 'big' 'powerful rifle'
27              outside the target at home so they could go to
               war if any police officer showed up at an
28              inopportune time.  In a clear reference to the

                                    5

machine gun, <u>Tran bragged that he could take out</u>
<u>five cops in a second if he had to do so.</u>"

(<u>Id.</u> at 37-38.)

As Judge Guilford continued:

> That is a serious offense, and my sentence needs
> to take into account the seriousness of the
> offense.  I certainly need to promote respect for
> the law and provide a just punishment.  I need to
> convince others not to engage in this conduct.
> Aspects of the law show concern about what people
> say.  "<u>Five cops in a second</u>" <u>is a serious</u>
> <u>statement here</u>.  Perhaps most importantly to me
> is <u>I need to protect the public from further</u>
> <u>crimes of the defendant</u>....

(<u>Id.</u> at 38.)

Defendant PARK also received a 15-year sentence (CR 380, 381)
because Judge Guilford thought the defendants were similarly situated
and deserved identical sentences.  (<u>See</u> CR 394; RT 7/11/18: 40.)

**E.**   **<u>Incarceration and Projected Release Date</u>**

Defendant is currently serving his sentence at the Federal
Correctional Institution I in Oakdale, Louisiana ("FCI Oakdale").
Counting from the day of his arrest in July 2008, defendant has
served approximately 11 years & 9 months of his 15-year sentence.
According to the BOP's website, defendant's projected release date is
approximately one year from now: June 4, 2021.

**F.**   **<u>Defendant's Failure to Exhaust Administrative Remedies</u>**

In his motion, defendant claims that he has attempted to exhaust
administrative remedies.  (<u>See</u> Mtn. at 10-11; <u>see</u> <u>also</u> Exs. At pgs.
1-3) (Defendant's E-Mail Declarations).)  Defendant claims that "he
was able to submit the request" for compassionate release on Monday,
March 30, 2020.  (Mtn. at 11.)  He further alleges that, on the next
day, March 31, 2020, the staff posted a memorandum stating that the
institution was "waiting for guidance" before they would process any

1    immediate release request pursuant to the Barr Memo.  (<u>Id.</u>)  Finally,
2    defendant's motion claims that, on Thursday, April 2, 2020, defendant
3    "spoke directly to Warden R. Myers, who refused to accept the Request
4    (a copy of the one initially submitted)," and "the request was
5    [thereafter] returned to him by staff, with no action having been
6    taken," on Friday, April 3, 2020.  (<u>Id.</u>)

7         In his e-mail/declaration, however, defendant TRAN states it
8    somewhat differently, and essentially admits that he's relying on an
9    assumption.  In his second e-mail/declaration dated April 4, 2020,
10   defendant says that, "[o]n the returned Cop-Out, there was no
11   Disposition, nothing was noted.  This is a Denial by the Warden plain
12   and simple."  (Def. Exs. at 3.)

13        Within the short time available to respond to defendant's
14   "emergency" motion, government counsel has investigated these
15   allegations with the assistance of BOP Counsel.  BOP and FCI-Oakdale
16   staff has been inundated with similar requests.  Nonetheless, at
17   present, government counsel has been advised as follows:

18        1.   The Case Manager for defendant TRAN at FCI Oakdale has said
19   that he has no knowledge of any RIS request (<u>i.e.</u>, a Request for a
20   Reduction in Sentence ("RIS")) submitted by defendant TRAN.  (A Case
21   Manager is on an inmate's Unit Team, and they ordinarily are the
22   staff that provide and receive administrative remedy forms from the
23   inmate population.)

24        2.   Moreover, the Case Manager has advised that TRAN has not
25   submitted any "cop-outs" to him regarding an RIS request.  (An RIS
26   request is the same thing as compassionate release request, and a
27   "cop-out" is an "Inmate Request to Staff" form that can be
28   handwritten or electronically sent to staff.)

7

3.    There was no memo sent out stating the BOP staff cannot process RIS requests or grievances.

4.    Defendant TRAN has submitted a BP-9 (Administrative Remedy) form to the Warden's Office.  The date of its submission is unclear.  The BP-9 (Administrative Remedy) form is reportedly being processed now, but the BOP's SENTRY Administrative Remedy Generalized Retrieval Report regarding defendant TRAN does not yet reflect it being filed.  Government counsel and BOP Legal have requested, but not yet received, a copy of that BP-9 form from FCI-Oakdale staff.  Thus, the substance of the form and any remedy requested therein is not yet known by counsel.

5.    The RIS Coordinator at FCI Oakdale last stated that defendant TRAN has not submitted an RIS request.  So, the BP-9 form referenced above was not considered an RIS/compassionate-release request.  Thus, as of this date, based on currently available information, government counsel is informed that defendant TRAN has not yet submitted a request to the Warden's Office.

Because these facts are, of course, important to the issue of defendant's exhaustion of administrative-remedies, government counsel will continue to pursue relevant information and update this submission as soon as additional facts are confirmed.  This opposition is submitted at this time in light of the "emergency" nature of the motion and today's deadline.

G.    **The Bureau of Prisons' and Congress's Response to COVID-19**

1.    **BOP's COVID-19-Specific Safety Precautions**

BOP has taken aggressive steps to protect inmates' health and to resist the spread of COVID-19.  "[M]aintaining safety and security of BOP institutions is [the BOP's] highest priority."  BOP, Updates to

8

1   BOP COVID-19 Action Plan: Inmate Movement (Mar. 19, 2020), <u>available</u>

2   <u>at</u> <u>https://www.bop.gov/resources/news/20200319_covid19_update.jsp</u>.

3   Thus, the BOP Director recently emphasized that the "response [to

4   COVID-19] is the Bureau's top priority."  BOP, Statement from BOP

5   Director (Mar. 26, 2020) (Statement from BOP Director), <u>available at</u>

6   <u>https://www.bop.gov/resources/news/20200326_statement_from_director.j</u>

7   <u>sp</u>.

8        The BOP has never underestimated the threat of infectious

9   disease.  To the contrary, the BOP has had a Pandemic Influenza Plan

10  in place since 2012.  <u>Id.</u>; BOP, Pandemic Influenza Plan---Module 1:

11  Surveillance and Infection Control (Oct. 2012), <u>available at</u>

12  <u>https://www.bop.gov/resources/pdfs/pan_flu_module_1.pdf</u>.  That

13  protocol is astoundingly detailed, establishing a six-phase framework

14  requiring BOP facilities to begin preparations when there is first a

15  "suspected human outbreak <u>overseas</u>."  <u>Id.</u> at i (emphasis added).

16       At extremely early stages, the Pandemic Influenza Protocol

17  requires BOP facilities to ensure inmates' access to soap, to train

18  them on hand-hygiene practices, and to ensure adequate infection-

19  control supplies.  <u>Id.</u> at 9.  For every phase thereafter (from

20  preliminary preparation, to a response to active pandemic, to

21  recovery), it includes detailed procedures required of <u>every</u> BOP

22  facility.  <u>Id.</u> at 9-11.  These include policies for ensuring for

23  creating "social distance" and for requiring "frequent environmental

24  cleaning of 'high-touch' surfaces."  <u>Id.</u> at 2-3, 6.  Facilities must

25  follow protocols on how to identify sick inmates, track their

26  interactions, and quarantine the exposed.  <u>Id.</u> at 4-5.  They must

27  also establish contingency plans to ensure that medical care is not

28  disrupted, even when faced with an influx of sick inmates.  BOP,

Pandemic Influenza Plan--Module 3: Health Care Delivery (October 2012), available at

https://www.bop.gov/resources/pdfs/pan_flu_module_3.pdf.  (The BOP has similar protocols for a wide range of diseases.  See BOP Program Statement No. 6190.04, Infectious Disease Management (June 3, 2014), available at https://www.bop.gov/policy/progstat/6190_004.pdf.)

The BOP implemented its Pandemic Influenza Protocol in January 2020, modified as a COVID-19 Action Plan.  BOP, Action Plan Phase V (Mar. 31, 2020) ("Action Plan Phase V"), available at

https://www.bop.gov/resources/news/20200331_covid19_action_plan_5.jsp In Phase 1 of that plan, the BOP began developing policies in consultation with the Centers for Disease Control.  See BOP, COVID-19 Action Plan: Agency-Wide Modified Operations (March 13, 2020) ("BOP Action Plan"), available at

https://www.bop.gov/resources/news/20200313_covid-19.jsp.

Since then, the BOP has serially escalated its response.  BOP, Bureau of Prisons Update on COVID-19 (Mar. 24, 2020), available at

https://www.bop.gov/resources/news/pdfs/20200324_bop_press_release_covid19_update.pdf.  On March 13, the BOP moved to Phase 2 of its Action Plan, taking steps to "mitigate the spread of COVID-19" in prisons, for the protection of both inmates and staff.  See BOP Action Plan, supra.  The BOP suspended social and legal visits, curtailed inmate movement, established enhanced screening procedures for inmates and staff, and curtailed staff travel.  Id.  Consistent with the Pandemic Flu Protocol, facilities adopted "modified operations"---including staggered meal and recreation times---to promote social distancing.  Id.  Just five days later, the BOP escalated to Phase 3--taking additional steps, including ensuring

1    that "all cleaning, sanitation, and medical supplies" had been

2    inventoried and were adequately stocked.  Id.

3         Phases 4 and 5 followed in late March.  Beginning March 26, the

4    BOP required all newly admitted inmates to be quarantined or isolated

5    for a minimum of 14 days "or until cleared by medical staff." See

6    Action Plan Phase V, supra.  And, as of April 1, the BOP has

7    instituted a nationwide lockdown.  Id.  For at least a two-week

8    period, "inmates in every institution will be secured in their

9    assigned cells/quarters to decrease the spread of the virus." Id.

10    The BOP has also "significantly decreas[ed] incoming movement.  Id.

11         The gravity and severity of these measures reflect BOP's

12    commitment to fighting COVID-19 and protecting inmates.  And,

13    although the BOP has not been immune from the pandemic, it has "thus

14    far been fortunate in that [its] rate of COVID-19 infection is

15    remarkably low."  Statement from BOP Director, supra.

16         As of April 9, 2020--despite tens of thousands of COVID-19 cases

17    across the country and over 146,000 inmates in BOP custody--284

18    federal inmates and 125 BOP staff have confirmed-positive test

19    results for COVID-19 nationwide.  All are being isolated from other

20    inmates and receiving medical treatment.  BOP, COVID-19 Coronavirus

21    (updated daily at 12pm Pacific), available at

22    https://www.bop.gov/coronavirus/index.jsp  At present, within the BOP

23    system, there have been 8 federal inmate deaths and 0 BOP staff

24    member deaths attributed to COVID-19 disease.

25         According to the latest information available on the BOP's

26    website (as of April 9, 2020), in defendant's facility (FCI Oakdale),

27    there have been 36 inmates and 14 BOP staff diagnosed with COVID-19.

28    (Id.)  Of those, 5 inmates have died.  (Id.)  However, in some

indication of a leveling-off of the situation, the last such death at FCI Oakdale reportedly occurred six days ago, on or about April 3, 2020.

Of course, "as warned by the Surgeon General of the United States, [the BOP] expect[s] to have more cases as the virus continues to spread in the general community," but they "will continue to diligently support all persons system-wide while doing everything [they] can to do [their] part in mitigating the spread of the virus." Statement from BOP Director, <u>supra</u>.

## 2. **Administrative Options Available to Inmates**

Inmates with COVID-19-based concerns also have a variety of administrative options they can pursue through the BOP itself. Although not reviewable by courts, these options include far more flexible remedies than permanent reduction of a sentence under 18 U.S.C. § 3582(c)(1)(A)--remedies better suited to a temporary (if dire) pandemic. See generally 18 U.S.C. § 3621(b) (precluding judicial review of BOP placement decisions); Reeb v. Thomas, 636 F.3d 1224, 1226-28 (9th Cir. 2011) (courts lack jurisdiction to review BOP's placement decisions under 18 U.S.C. §§ 3622-24); United States v. Grass, 561 F. Supp. 2d 535, 537 (E.D. Pa. 2008) (same).

First, the BOP can transfer vulnerable inmates to home confinement. See generally 18 U.S.C. § 3624(c)(2). The CARES Act, which Congress passed to address the COVID-19 crisis, vastly increased BOP's statutory authority to do so. See Coronavirus Aid, Relief, and Economic Security Act ("CARES Act"), Pub. L. No. 116-136, § 12003(b)(2), 134 Stat. 281, 516 (March 27, 2020) (allowing BOP to "lengthen the maximum amount of time the Director is authorized to place a prisoner in home confinement" under 18 U.S.C. § 3624(c)(2)).

Under this expanded authority--which came into effect only on April 3, 2020--inmates "do not need to apply to be considered for home confinement."  Federal Bureau of Prisons, Home Confinement (Apr. 5, 2020) ("BOP, Home Confinement"), available at https://www.bop.gov/resources/news/20200405_covid19_home_confinement.jsp.

In his April 3, 2020, memorandum authorizing the BOP to exercise its expanded CARES Act authority, the Attorney General emphasized that "time is of the essence," and he directed the BOP to focus on facilities that have significant numbers of COVID-19 cases within their inmate population.  Attorney General, Memorandum for Director of Bureau of Prisons Re: Increasing Use of Home Confinement at Institutions Most Affected by COVID-19 (April 3, 2020), available at https://www.justice.gov/file/1266661/download.  Thus, as of April 3, the BOP is "urgently reviewing all inmates" to determine their eligibility, increasing resources to "review and make appropriate decisions as soon as possible."  BOP Home Confinement, supra (emphasis added).

Even before its expanded CARES Act authority came into effect, the BOP had placed "an additional 566 inmates on home confinement" to address the COVID-19 crisis, bringing the national total to nearly 3,500.  Id.  This was consistent with the Attorney General's March 26, 2020, memorandum encouraging the BOP to exercise pre-CARES-Act authority as broadly as possible to protect "the people in [their] custody," taking into consideration prisoners' age, vulnerability to COVID-19, and other factors.  See Attorney General, Memorandum for Director of Bureau of Prisons Re: Prioritization of Home Confinement

as Appropriate in Response to COVID-19 Pandemic (March 26, 2020),

available at https://www.justice.gov/file/1262731/download.

Second, the BOP has authority to grant an inmate a temporary furlough from custody, under 18 U.S.C. § 3622, for "obtaining medical treatment not otherwise available," "visiting a relative who is dying," or "any other significant activity consistent with the public interest." See BOP Program Statement No. 5280.09, Inmate Furloughs (January 20, 2011), available at https://www.bop.gov/policy/progstat/5280_009.pdf. Certain COVID-19-related conditions would potentially satisfy the BOP's requirements for such a furlough. Id.

Finally, under 18 U.S.C. § 3582(c)(1)(A)--which, unlike BOP's placement decisions, allows for judicial review--the BOP has initial authority to assess inmates' applications for compassionate release. The BOP, which has decades of experience diligently assessing such applications, has detailed regulations setting forth relevant procedures and considerations. See BOP Program Statement No. 5050.50, Compassionate Release/Reduction in Sentence: Procedures for Implementation of 18 U.S.C. §§ 3582 and 4205(g) (January 17, 2019), available at https://www.bop.gov/policy/progstat/5050_050_EN.pdf.

However, as noted above, BOP has no record of defendant filing any such administrative request for compassionate release with the BOP. Even if, as he claims, defendant attempted to file such a request administratively, defendant alleges that he first attempted to do so on March 27, 2020. (See Defendant's E-Mail Declarations, at pages 17-19 of the Motion.) Thus, defendant's motion is premature because it was filed before allowing the BOP the statutorily-mandated 30 days to evaluate and act on that request. As a result, there is

14

1  no administrative record yet to review of the BOP's assessment of the
2  statutory compassionate-release factors.

3        **III. <u>LEGAL FRAMEWORK FOR COMPASSIONATE RELEASE</u>**

4        A compassionate-release motion is a request for a <u>permanent</u>
5  <u>reduction</u> in a defendant's federal sentence.  A district court
6  generally "may not modify a term of imprisonment once it has been
7  imposed."  <u>See</u> 18 U.S.C. § 3582(c); <u>see</u> <u>Dillon v. United States</u>, 560
8  U.S. 817, 824-25 (2010).  Compassionate release is one of the few
9  exceptions to this rule, allowing a court to "reduce the term of
10 imprisonment (and . . . impose a term of probation or supervised
11 release with or without conditions that does not exceed the unserved
12 portion of the original term of imprisonment)[.]"  18 U.S.C.
13 § 3582(c)(1).

14       Because this relief is both drastic and permanent, it is subject
15 to strict statutory conditions.  <u>First</u>, a district court can evaluate
16 a defendant's request for compassionate release <u>only</u> "after the
17 defendant has fully exhausted all administrative rights" before the
18 BOP.  Specifically:

19             after the defendant has fully exhausted all
               administrative rights to appeal a failure of the
20             Bureau of Prisons to bring a motion on the
               defendant's behalf or the lapse of 30 days from
21             the receipt of such a request by the warden of
               the defendant's facility, whichever is earlier[.]
22
23 18 U.S.C. § 3582(c)(1)(A).  This requirement is mandatory and
   jurisdictional.  <u>See</u> <u>generally</u> <u>Shaw v. Bank of America Corp.</u>, 946
24
   F.3d 533, 541 (9th Cir. 2019) ("statutorily-provided exhaustion
25
   requirements deprive the court of jurisdiction"); <u>United States v.</u>
26
   <u>Weidenhamer</u>, No. CR016-01072-001-PHX-ROS, 2019 WL 6050264, at *2
27
28 (D. Az. Nov. 8, 2019) (citing cases).

Second, in evaluating compassionate-release motions, courts must follow both the statute and binding policy statements. See id.; 28 U.S.C. § 994(t); USSG § 1B1.13. Pursuant to those authorities, to be eligible for compassionate release, a defendant must demonstrate: (1) the existence of extraordinary and compelling reasons, within the meaning of the statute; and (2) that he is not a danger to the community. 18 U.S.C. § 3582(c)(1)(A). Specifically, the statute requires that any reduction be "consistent with applicable policy statements issued by the Sentencing Commission"--in this case, USSG § 1B1.13. Id. As the Supreme Court recognized in Dillon, 560 U.S. at 827, because § 3582(c) permits a sentencing reduction only where it is "consistent with applicable policy statements issued by the Sentencing Commission," such policy statements are binding on a court determining eligibility.

USSG § 1B1.13 explicitly defines the "extraordinary and compelling reasons" that make a defendant eligible for compassionate release. See 28 U.S.C. § 994(t). They include, as relevant here, (1) a "terminal illness"; (2) a serious medical condition that "that substantially diminishes the ability of the defendant to provide self-care within the environment of a correctional facility and from which he or she is not expected to recover"; or (3) a defendant who is at least 65 years old, is experiencing a serious deterioration in physical or mental health because of the aging process, and "has served at least 10 years or 75 percent of his or her term of imprisonment, whichever is less." USSG § 1B1.13 (other grounds omitted). USSG § 1B1.13, comment. (n.1(A)-(B)). "[R]ehabilitation of the defendant is not, by itself, an extraordinary and compelling reason for purposes of this policy statement." Id., comment. (n.3).

Defendant bears the burden to prove both (1) he has "exhausted all administrative rights" and (2) that "extraordinary and compelling reasons" exist to support his motion.  See 18 U.S.C. § 3582(c)(1)(A); see United States v. Greenhut, No. 18-CR-48-CAS, 2020 WL 509385, at *1 (C.D. Cal. Jan. 31, 2020) (defendant bears the burden of establishing entitlement to sentencing reduction); United States v. Hamilton, 715 F.3d 328, 337 (11th Cir. 2013) ("defendant, as the § 3582(c)(2) movant, bears the burden of establishing" eligibility); see generally  United States v. Butler, 970 F.2d 1017, 1026 (2d Cir. 1992) ("A party with an affirmative goal and presumptive access to proof on a given issue normally has the burden of proof as to that issue.").

Third, even for defendants who are statutorily eligible, compassionate release is a "rare" and "extraordinary" remedy, within district courts' discretion to deny.  United States v. Chambliss, 948 F.3d 691, 693-94 (5th Cir. 2020); United States v. Mangarella, No. 06-CR-151, 2020 WL 1291835, at *2-3 (W.D.N.C. Mar. 16, 2020). Specifically, "it is a rare case in which health conditions present an 'exceptional reason'" to allow for release where detention would otherwise be warranted.  See, e.g., United States v. Wages, 271 F. App'x 726, 728 (10th Cir. 2008) (collecting pre-trial detention cases); accord United States v. Willis, 382 F. Supp. 3d 1185, 1188 (D.N.M. 2019) ("most courts treat compassionate release 'due to medical conditions [a]s ... a rare event.").  This reluctance to expansively apply compassionate release is grounded in a concern that any less narrow application would yield significant sentencing disparities.  United States v. Ebbers, -- F. Supp. 3d. --, 2020 WL 91399, at *6 (S.D.N.Y. Jan. 8, 2020).

17

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

## IV.   ARGUMENT

Defendant's motion must be dismissed, because he has failed to exhaust administrative remedies.  At minimum, the Court should stay consideration of the motion until after the BOP has had the statutorily-prescribed period to adjudicate defendant's unconfirmed administrative request--a period during which the BOP can also consider defendant's eligibility for a transfer to home confinement. Even if this Court could reach the motion's merits, defendant's claims must be rejected because (1) he is not eligible for compassionate release; and (2) even if he were, the COVID-19 crisis does not justify a permanent, irrevocable reduction in his sentence, especially in light of the unfair disparity that would create vis-a-vis his co-defendant.

## A.   Defendant Has Failed to Exhaust Administrative Remedies, And The Court Lacks Jurisdiction to Consider His Claims

This Court lacks authority to act on defendant's compassionate-release motion at this time.  Under 18 U.S.C. § 3582(c)(1)(A), the Court "may not modify a term of imprisonment once it has been imposed except" upon a defendant's motion "after the defendant has fully exhausted all administrative rights to appeal a failure of the Bureau of Prisons to bring a motion on the defendant's behalf or the lapse of 30 days from the receipt of such a request by the warden of the defendant's facility, whichever is earlier[.]"

Because this statutory condition has not been satisfied here, the Court lacks authority to adjudicate defendant's claims.  See Shaw, 946 F.3d at 541.  Moreover, contrary to defendant's assertion, failure to exhaust cannot be excused.  Instead, as the Third Circuit recently held, § 3882(c)(1)(A) "presents a glaring roadblock

18

foreclosing compassionate release at this point.  <u>United States v. Raia</u>, No. 20-1033, 2020 WL 1647922, at *2 (3d Cir. Apr. 2, 2020).

1. **Defendant Has Not Clearly Filed An Administrative Request For Compassionate Release And, Even If He Did So On The Date Alleged), He Has Not Waited The Requisite 30-Days To Allow BOP To Consider Any Such Request**

Defendant claims that "he was able to submit the request" for compassionate release on Monday, March 30, 2020, and that it was returned with no action, which he assumes constitutes a rejection of his request by the Warden at FCI Oakdale.  (<u>See</u> Mtn. at 11; Deft's Apr. 4, 2020 E-Mail Declaration, at page 3 of Defense Exhibits.)

However, defendant's motion does not provide the Court or government counsel with copies of any such request.  We are asked to rely simply upon an allegation made by defendant in e-mail, though under penalty of perjury.  Moreover, although the government's investigation is not yet complete due to the "emergency" rushed nature of this process, the information available to counsel <u>at this time</u> indicates that BOP has <u>no record</u> of defendant TRAN making a request for compassionate release.  Thus, on this record, it is not clear that defendant has, in fact, effectively filed any administrative request for compassionate release with the warden at all.  Before the Court may decide this motion, defendant must file that request.  Only after 30 days from the BOP's receipt of that request can this Court consider defendant's motion.  18 U.S.C. § 3582(c)(1)(A)(i).  Even then, a stay may be warranted to allow the BOP to complete its own review.

Even if the Court were to accept as true defendant's allegation that he submitted a proper administrative request for compassionate

release, defendant admits that "the request" was filed on Monday, March 30, 2020.  If true, the statutorily mandated period of 30 days for BOP to evaluate and act on any such request has not yet elapsed, as required by 18 U.S.C. § 3582(c)(1)(A)(i).  Accordingly, the Court should dismiss the motion as premature or otherwise stay its consideration until defendant has clearly filed the required request and BOP has been given an opportunity to complete its administrative review of the request.

At present, defendant simply asks the Court to assume that (1) he's filed such a request, (2) the Warden at FCI Oakdale has already denied it without comment, and (3) defendant is, therefore, entitled to immediate release from prison.  This kind of harried, undocumented rush to force BOP to release a violent offender is not what the law envisions, and the Court should not countenance it.

## 2. **Failure to Exhaust Cannot be Excused**

"[S]tatutorily-provided exhaustion requirements deprive the court of jurisdiction and, thus, preclude any exercise of discretion by the Court."  Shaw, 946 F.3d at 533 (citation omitted).  Given § 3582(c)(1)(A)'s plain language and purpose, the requirements for filing a sentence reduction motion--including the that defendant exhaust administrative remedies or wait 30 days after filing a request with the warden--are jurisdictional.  Section 3582(c) states that a "court may not modify" a term of imprisonment except in enumerated circumstances.  18 U.S.C. § 3582(c).  It thus "speak[s] to the power of the court," Landgraf v. USI Film Prods., 511 U.S. 244, 274 (1994) (citation omitted), delineating "when, and under what conditions," a court may exercise its "adjudicatory authority," Bowles v. Russell, 551 U.S. 205, 212-13 (2007) (quoting Eberhart v.

_United States_, 546 U.S. 12, 16 (2005) (per curiam)).  That conclusion is reinforced by courts' historical powerlessness to modify a sentence once entered.  See _Dillon_, 560 U.S. at 825; _United States v. Mayer_, 235 U.S. 55, 67-69 (1914).

However, although the government maintains that § 3582(c)(1)(A)'s time limit is jurisdictional, the point is ultimately academic.  Even if § 3682(c)(1)(A)'s exhaustion requirement is not jurisdictional, it is at least a mandatory claim-processing rule that must be enforced if a party "properly raise[s]" it.  _Eberhart_, 546 U.S. at 19; see generally _Fort Bend County v. Davis_, 139 S. Ct. 1843, 1848-50 (2019).  The government raises the rule here, and it thus must be enforced

COVID-19 does not alter this conclusion.  While judicially created exhaustion requirements may sometimes be excused, a court may not ignore a statutory command.  "[M]andatory exhaustion statutes . . . establish mandatory exhaustion regimes, foreclosing judicial discretion."  _Ross v. Blake_, 136 S. Ct. 1850, 1857 (2016).  Thus, exhaustion remains mandatory regardless of a court's view of the merits: "[o]bviously, the rules requiring exhaustion of the administrative remedy cannot be circumvented" simply by "asserting that [an opposing party's argument is] groundless[.]"  _Meyers v. Bethlehem Shipping Corp._, 303 U.S. 41, 51-52 (1938).

Consistent with these rules, numerous courts have rejected similar claims in the context of unexhausted COVID-19-based requests for compassionate release.  "Because defendant failed to exhaust his administrative remedies, his request for compassionate release based on COVID-19 concerns fails."  _United States v. Shah_, No. 10-70-CJC, ECF No. 329, at 3 (C.D. Cal. Mar. 30, 2020).  Absent such exhaustion,

the court "does not have authority to grant the requested relief."
<u>United States v. Sloane</u>, No. 19-CR-10117-IT-11, ECF No. 647, at 2 (D.
Mass. Mar. 19, 2020) (noting no request made to the USP Lompoc
Warden); <u>United States v. Gileno</u>, No. 19-CR-161-VAB-1, 2020 WL
1307108, at *3—*4 (D. Conn. Mar. 19, 2020) (denying COVID-19-based
compassionate-release motion for lack of exhaustion); <u>United States
v. Eberhart</u>, No. 13-CR-313-PJH-1, 2020 WL 1450745, at *2 (N.D. Cal.
Mar25, 2020) (same); <u>United States v. Neman</u>, No. 14-521-JAK, ECF No.
863, at 4—6 (C.D. Cal. Mar. 30, 2020) (same).

Exhaustion is particularly inexcusable for errors that an
administrative tribunal is competent to address.  <u>Barron v. Ashcroft</u>,
358 F.3d 674, 678 (9th Cir. 2004).  Indeed, "[g]iven BOP's shared
desire for a safe and healthy prison environment . . . strict
compliance with § 3582(c)(1)(A)'s exhaustion requirement takes on
added--and critical--importance." <u>Raia</u>, 2020 WL 1647922, at *2.
Here, the BOP is not merely competent to address defendant's
compassionate-release claims; it is uniquely qualified to do so.
Until First Step Act, the BOP had exclusive authority to adjudicate
such claims.  Notably, the First Step Act did not change the factors
relevant to compassionate release, only the procedures by which a
defendant can raise such claims.  <u>Ebbers</u>, 2020 WL 91399, at *4.  The
BOP thus has immense expertise, both in (1) assessing the safety and
health of their inmates and (2) managing the administration of their
facilities.  As noted above, it likewise has other administrative
procedures potentially available for addressing COVID-19-based
concerns--none of which defendant has given them an opportunity to
evaluate.  Exhaustion cannot--but also should not--be excused.
<u>Eberhart</u>, 2020 WL 1450745, at *2 (declining to excuse failure to

1  exhaust COVID-19 compassionate-release motion); <u>Neman</u>, No. 14-521-

2  JAK, ECF No. 863, at 6 (same).

3       Until 30 days have elapsed from the date defendant applies for

4  compassionate release within BOP, this Court lacks authority to grant

5  relief.  18 U.S.C. § 3582(c)(1)(1).  The Court should thus dismiss

6  defendant's motion.  At minimum, the Court should stay consideration

7  of the motion until the BOP has completed its administrative review.

8  **B.   Defendant Has Failed to Demonstrate an "Extraordinary and**

9      **Compelling" Reason to Grant Permanent Compassionate Release**

10      Even if the Court had authority to consider the merits of

11  defendant's unexhausted request, defendant has failed to establish

12  his eligibility for compassionate release.  "The First Step Act did

13  not revise the substantive criteria for compassionate release" --

14  criteria that are set forth in the Sentencing Commission's binding

15  "policy statement," USSG 1B1.13.  <u>Ebbers</u>, 2020 WL 91399, at *4—*5; 18

16  U.S.C. § 3582(c)(1)(A).  Here, defendant does not identify an

17  "extraordinary and compelling reason warrant[ing]" a reduction under

18  that definition.  18 U.S.C. § 3582(c)(1)(A).  Defendant is thus

19  ineligible for compassionate release.

20      As the Third Circuit recently held, "[w]e do not mean to

21  minimize the risks that COVID-19 poses in the federal prison system,"

22  but the "mere existence of COVID-19 in society and the possibility

23  that it may spread to a particular prison cannot independently

24  justify compassionate release" -- particularly given "BOP's statutory

25  role, and its extensive and professional efforts to curtail the

26  virus's spread."  <u>Raia</u>, 2020 WL 1647922, at *2.

27

28

1

      **1.**   **Defendant is Not Eligible for Compassionate Release**

2

    As a matter of law, a defendant is eligible for compassionate

3 release only if he can demonstrate "extraordinary and compelling

4 reasons warrant[ing] such a reduction," "consistent with applicable

5 policy statements issued by the Sentencing Commission." Id. Thus,

6 as courts have recognized, Congress intended that the "Sentencing

7 Commission, not the judiciary, determine what constitutes an

8 appropriate use of the 'compassionate release' provision." United

9 States v. Willingham, No. CR113-010, 2019 WL 6733028, at *2 (S.D. Ga.

10 Dec. 10, 2019) (noting split in authority).  The Sentencing

11 Commission's policy statement (see USSG § 1B.1.13) is thus binding on

12 this Court.  See Dillon, 560 U.S. at 827; see, e.g., United States v.

13 Nasirun, No. 8:99-CR-367, 2020 WL 686030, at *2 (M.D. Fla. Feb. 11,

14 2020).

15

    "General concerns about possible exposure to COVID-19 do not

16 meet the criteria for extraordinary and compelling reasons for a

17 reduction in sentence set forth in the Sentencing Commission's policy

18 statement[.]" Eberhart, 2020 WL 1450745, *2.  Those criteria

19 include, as relevant here:

20       • The medical condition "of the defendant":

21         specifically, whether the defendant has either a

22         "terminal illness" or a "serious physical or medical

23         condition" that "substantially diminishes the

24         ability of the defendant to provide self-care within

25         the environment of a correctional facility and from

26         which he . . . is not expected to recover." USSG

27         § 1B1.13, comment. (n.1(A)(i)-(ii));

28

- The "age of the defendant": specifically, whether
  defendant is "at least 65 years old," is
  "experiencing a serious deterioration in physical or
  mental health because of the aging process," and has
  served at least 10 years or 75% of his term of
  imprisonment.  Id., comment. (n. 1(B)); or

- "As determined by the Director of the Bureau of
  Prisons, there exists in the defendant's case an
  extraordinary and compelling reason other than, or
  in combination with," his illness, age, and family
  circumstances.  Id., comment. (n.1(D)).[2]

The global COVID-19 pandemic is not a factor unique to defendant's case at all -- and, while his concerns are certainly not frivolous, he offers no case-specific facts establishing his eligibility for compassionate release under USSG § 1B1.13.  Although defendant has health concerns (an asthma condition), defendant's motion relies primarily on the generalized risk of COVID-19 -- arguments that are common, wide-ranging, and would apply to essentially every unhealthy inmate presently in custody.  Although FCI Oakdale lost 5 inmates to COVID-19 during the period between late-March and April 3, 2020, BOP's prompt mitigation efforts appear to be having the desired effect of safeguarding the inmate population at FCI Oakdale, as no new COVID-related deaths have been reported

---

[2] Thus, the Court may consider factors set forth in the relevant BOP regulation governing compassionate release: BOP Program Statement No. 5050.50, Compassionate Release/Reduction in Sentence: Procedures for Implementation of 18 U.S.C. §§ 3582 and 4205(g) (January 17, 2019), available at https://www.bop.gov/policy/progstat/5050_050_EN.pdf.  Those factors make no material difference here.

25

1    since April 3, 2020.  See BOP COVID-19 Resource,

2    https://www.bop.gov/coronavirus/index.jsp (as of April 9, 2020).

3         Particularly considering both how the BOP has addressed COVID-19

4    generally and at FCI Oakdale, defendant's circumstances are not

5    sufficiently extraordinary and compelling to justify a modified

6    sentence.  Indeed, defendant's arguments totally overlook the BOP's

7    ability to treat infectious disease.  Even chronic conditions "that

8    can be managed in prison are not a sufficient basis for compassionate

9    release."  United States v. Ayon-Nunez, No. 16-cR-130-DAD, 2020 WL

10   704785, at *2-3 (E.D. Cal. Feb. 12, 2020).  Thus, the Court "cannot

11   assume that the Bureau of Prisons will be unable to manage [any]

12   outbreak or adequately treat [defendant] should it emerge at his

13   correctional facility while he is still incarcerated."  Gileno, 2020

14   WL 1307108, at *4 (denying compassionate-release motion in COVID-19-

15   related case involving a defendant who raised specific health

16   concerns); accord Shah, No. 10-70-CJC, ECF No. 329, at 3.  By

17   defendant's logic, such conditions would universally qualify

18   convicted inmates for shorter sentences given the present pandemic.

19   That is not and cannot be the case.

20        Defendant's specific health concern does not alter this

21   conclusion.  Although defendant has an asthma condition, his motion

22   fails to demonstrate that the condition is serious or that it

23   currently exposes him to undue risk of infection.  In defendant's

24   April 2010 Pre-Sentence Report, the USPO noted that "Tran suffered

25   from asthma during childhood and less severe asthma as an adult."

26   (PSR 85.)  Thus, the severity and associated-risk of the condition

27   are unclear.  Moreover, BOP's medical staff at FCI Oakdale are in a

28   far better position to assess defendant's current asthma condition

                                    26

1   and evaluate whether the COVID-19 situation warrants a release,

2   transfer, or other relief.  Under applicable law, the BOP must be

3   given an opportunity to make those decisions in the first instance.

4       These health concerns do not, by themselves, satisfy USSG

5   § 1B1.13.  Defendant is not, for example, terminally-ill, or subject

6   to a serious and unrecoverable condition that makes him unable to

7   "provide self-care" within a BOP facility.  USSG § 1B1.13, comment.

8   (n.1(A)(i)-(ii).  Defendant also does not satisfy the statute's age-

9   related conditions.  Id., comment. (n.1(B)).  Instead, he relies on

10  diagnoses that universally fall short of qualifying conditions.

11      Indeed, a motions panel of the Third Circuit recently denied a

12  motion for bail pending appeal based on COVID-19 concerns that were

13  argued to be amplified because of the defendant's specific health

14  problems.  In United States v. Davis, No. 19-1604, ECF No. 50 (3d

15  Cir. Mar. 20, 2020), appellant James Davis sought release from

16  custody pending appeal due to a "severe risk of death from COVID-19,"

17  and specifically alleged that he was 69 years old and suffered from

18  **asthma**, heart arrhythmia, high blood pressure, cystitis, and a

19  history of prostate cancer with radiological treatment.  See

20  Emergency Motion for Bail Pending Appeal, United States v. Davis, No.

21  19-1604, ECF No. 43-1 (3d Cir. Mar. 17, 2020).  The appellant further

22  argued that while incarcerated, he lived in a shared cell with bunk-

23  style beds, in a unit housing over 100 inmates, where inmates had

24  close physical interaction.  Id.  Notwithstanding that more

25  compelling record, the Third Circuit denied Davis's motion for bail

26  pending appeal, without prejudice to him renewing the motion "if he

27  is diagnosed with COVID-19."  Davis, ECF No. 50 (3d Cir. Mar. 20,

28  2020).

Thus, mere anxiety about the risk of a COVID-19 infection, even when combined with defendant's health issue, simply does not present an "extraordinary and compelling reason" to release defendant early from his sentence.  Nor has defendant provided any evidence that he will be less likely to contract COVID-19 if released.  Defendant's circumstances are -- in the present pandemic -- far closer to ordinary than "extraordinary."  The motion must be denied.

**2.**   **Defendant Remains a Danger to the Community, Which Also Defeats his Eligibility for Release**

Defendant's motion -- even if properly exhausted, and even if defendant were otherwise eligible for relief -- must also be denied because he remains a danger to the community.

This Court may not reduce a defendant's sentence unless it finds that "the defendant is not a danger to the safety of any other person or to the community, as provided in 18 U.S.C. § 3142(g)." USSG § 1B1.13; see United States v. Gotti, No. 02-CR-743, 2020 WL 497987, at *6 (S.D.N.Y. 2020) (release was inappropriate regardless of extraordinary and compelling circumstances; defendant posed a continuing danger to the public); accord United States v. Urso, No. 03-CR-1382, 2019 WL 5423431, at *3 (E.D.N.Y. Oct. 23, 2019); United States v. Applewhite, No. 08-CR-60037, 2020 WL 137452, at *2 (D. Or. Jan. 13, 2020) (denying compassionate release for seriously ill 80-year-old inmate based on danger).

The record here precludes any such finding.  To the contrary, defendant poses a very real danger to the community.  As Judge Guilford found less than two years ago, at the time he resentenced defendants, defendant TRAN is convicted of a serious crime that required a 15-year sentence to protect the public.  That judgment is

1    unimpeachable on the facts of this case, with defendants who armed

2    themselves with five firearms (including a machinegun, silencer-

3    equipped AR-15 rifle, and silencer-equipped handgun), hundreds of

4    rounds of ammunition, zip-ties, and body armor, all in preparation

5    for committing a violent home-invasion robbery in a residential

6    community in Fountain Valley, CA.

7         In the current climate, irresponsible social habits also gravely

8    endanger the community.  United States v. Hir, 517 F.3d 1081, 1088

9    (9th Cir. 2008) ("community," within the meaning of 18 U.S.C. § 3142,

10   is not necessarily confined to local geography).  All California

11   residents are currently required to shelter in place and "heed the

12   current State public health directives" to avoid the spread of COVID-

13   19.  California Executive Order N-33-20 (March 19, 2020), available

14   at https://covid19.ca.gov/img/Executive-Order-N-33-20.pdf.  Such

15   rules, though enforceable by peace officers, rely largely on

16   voluntary compliance.  A person who ignores such rules could increase

17   infection rates, leading to citizens' severe illness and death.

18   **C.   Even If Defendant Were Otherwise Eligible, 18 U.S.C. § 3553(a)**

19   **     Factors Do Not Support a Shorter Sentence**

20        Finally, any compassionate-release decision -- even for a

21   statutorily eligible defendant -- must also consider the factors

22   under 18 U.S.C. § 3553(a).  See 18 U.S.C. § 3582(c)(1)(A)(i).

23   Defendant addresses none of these factors in his motion.  Those

24   factors -- which this Court already considered when imposing

25   defendant's 15-year sentence -- do not support his request for an

26   early, permanent release.  They support his original sentence.

27        At the time of the resentencing hearing in July 2018, the Court

28   (per Judge Guilford) rejected the request of both defendants TRAN and

                                      29

PARK for a time-served sentence of approximately 10 years.  (CR 394; RT 7/11/18: 37-40.)  The Court did so even though defendant had "done a good job in prison" and had "lot[s] of support from others," which "speaks well of [defendant TRAN]."  (RT 7/11/18: 37.) Notwithstanding defendant's claim that he was a changed man and a time-served sentence of 10 years was sufficient, the Court sentenced defendant to a sentence of 15 years' imprisonment, above the Guidelines range.  (CR 378, 379; see also CR 394; RT 7/11/18: 37-40.) In explaining its sentence, the Court said it felt a sentence of 15-years' imprisonment was necessary to achieve the goals of sentencing under § 3553(a), specifically, to account for the "nature and circumstances of the offense," "the seriousness of the offense," "to promote respect for the law and provide a just punishment," and "the need to protect the public from further crimes of the defendant." (RT 7/11/18: 37-40.)  Judge Guilford said that one of the "things that continue[d] to trouble [him] about the defendants" was "the callousness of the crimes that you were convicted of," namely, the callous disregard for the interests of others that defendants exhibited in undercover recordings in which they planned how to execute a violent, home-invasion robbery of a residence, "zip-tie" the occupants, use them as human "shields" if necessary to clear the house, and shoot and kill any occupant who resisted or tried to escape.  (Id. at 37-38.)  Judge Guilford was also very troubled by defendant TRAN's statement to the CI that, through use of his machinegun, he could "take out five cops in a second if he had to do so."  (Id.)

    Granting compassionate release would undermine the Court's careful consideration of these factors at the time of sentencing.

Moreover, defendant's pending motion for an early, permanent release implicates another important sentencing factor that was not relevant at the time of the resentencing hearing: namely, the need to avoid unwarranted disparity in sentencing.  18 U.S.C. § 3553(a)(6).

As to the issue of unwarranted disparities, it bears noting that defendant TRAN's co-defendant, YU SUNG PARK, was also resentenced to 15-years' imprisonment (CR 380, 381) because Judge Guilford thought "the circumstances are sufficiently similar for both [defendants]" and thus warranted identical sentences.  (See CR 394; RT 7/11/18: 40.)  Thus, defendant TRAN's request for an early, permanent release upends that result and creates significant unfairness vis-a-vis his co-defendant, PARK.[3]  That is especially true given that the evidence showed TRAN was the leader and organizer of the conspiracy.

## V.    CONCLUSION

Defendant's motion for compassionate release should be dismissed without prejudice or, in the alternative, stayed until the BOP has completed its administrative review.  Even if the Court could reach the merits of defendant's motion, the motion should be denied for the reasons set forth above.

Finally, the government requests that, if this Court ultimately grants relief, the government be given an opportunity to brief appropriate conditions -- including a release plan, a mandatory quarantine, and a period of home confinement as a condition of supervised release.  See 18 U.S.C. § 3582(c)(1)(A).

---

[3] BOP's website shows that defendant PARK is in custody at FCI Sandstone in Sandstone, Minnesota.

31

# EXHIBIT A



A-1



A-2





A-4











A-9